IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**AMY HAILEY**, an individual; **ALISHA KUENZI**, an individual; and **DANETTE BLAKE-SULLIVAN**, an individual,

            Plaintiffs,

    v.

**LEGACY HEALTH**, a Public Benefit Corporation; and **DOES 1–50**, Inclusive,

           Defendants.

Case No. 3:23-cv-00149-IM

**OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO STRIKE**

Ray D. Hacke, Pacific Justice Institute, 317 Court St. NE, Suite 202, Salem, OR 97301. Attorney for Plaintiffs.

Brenda K. Baumgart, Melissa J. Healy, Dominik Mackinnon, and Matthew A. Tellam, Stoel Rives LLP, 760 SW Ninth Ave., Suite 3000, Portland, OR 97205. Attorneys for Defendant Legacy Health.

**IMMERGUT, District Judge.**

       Before this Court is Defendant Legacy Health's Motion for Summary Judgment ("MSJ"),

ECF 19. Defendant is a regional healthcare provider that has been accused of violating Title VII

of the Civil Rights Act and O.R.S. 659.030 by failing to provide Plaintiffs with religious

PAGE 1 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

exceptions to its COVID-19 employee vaccine mandate. Plaintiffs Amy Hailey and Alisha Kuenzi are two former employees[1] of Defendant whose roles required direct, in-person contact with Defendant's patients and other employees. *See* Plaintiffs' Response ("Resp."), ECF 26 at 8. Plaintiffs were fired for refusing to take the vaccine. *See* MSJ, ECF 19 at 18; Resp., ECF 26 at 12. In its Motion, Defendant does not dispute Plaintiffs' prima facie Title VII claim and contends solely that it is entitled to summary judgment because there are no genuine disputes of material fact as to whether granting exceptions to Plaintiffs would have posed an undue hardship to Defendant's business. *See* MSJ, ECF 19 at 1–2; Defendant's Reply ("Reply"), ECF 30 at 2.

Based on the pleadings and factual record, this Court GRANTS Defendant's Motion for Summary Judgment. Defendant is entitled to judgment as a matter of law on its affirmative defense of undue hardship. Although Plaintiffs raised an aiding and abetting claim against unnamed Does in their Complaint, they have not defended that claim on summary judgment and have adduced no evidence concerning that claim. Accordingly, summary judgment is granted with respect to that claim as well.

## LEGAL STANDARDS

Summary judgment may be granted in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party will have the burden of proof on an issue at trial, such as a defendant on an affirmative defense, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty*

---

[1] According to Plaintiffs' Response, Plaintiff Danette Blake-Sullivan "has agreed to a settlement of all her claims against Legacy. Accordingly, Blake-Sullivan is not contesting Legacy's Motion herein." Resp., ECF 26 at 8 n.2.

PAGE 2 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

*Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (per curiam) (noting that a party moving for summary judgment on a claim for which it will have the burden at trial "must establish beyond controversy every essential element" of the claim (internal quotation marks omitted)).

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). A court may, in its discretion, consider the admissibility of evidence offered at summary judgment even when no objection is made. *See Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016). "Authentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Orr*, 285 F.3d at 773 (quoting Fed. R. Evid. 901(a)) (footnotes omitted). "[U]nauthenticated documents cannot be considered in a motion for summary judgment." *Id.* (collecting cases). "[D]ocuments authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Rule] 56[(c)(4)] and the affiant must be a person through whom the exhibits could be admitted into evidence.'" *Id.* at 773–74 (footnotes omitted). Similarly, "[b]ecause summary judgment qualifies as a substitute for a trial, and hearsay (absent an exception or exclusion) is inadmissible at trial, a motion for summary judgment may not be supported by hearsay. Courts have likewise held that papers opposing a motion for summary judgment may also not be supported by hearsay." *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022) (citations and emphasis omitted). Furthermore, "scientific, technical, or other specialized knowledge" must be introduced through an expert witness pursuant to Federal Rule of Evidence 702, and cannot be introduced through lay witnesses. *See Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 838–39 (S.D. Cal. 2020). Courts accordingly

have held that plaintiffs cannot "introduce [their] expert and/or his report as lay testimony" on summary judgment. *See Wynn v. Callan Appraisal Inc.*, 2:09-cv-01587-RCJ, 2012 WL 12925797, at *1 (D. Ariz. Feb. 24, 2012).

## BACKGROUND

### A. Undisputed Facts

#### 1. The Parties

Defendant Legacy Health is a major regional healthcare provider that operates eight hospitals in the Portland metro area, including a full-service children's hospital, a 24-hour mental and behavioral health services center, and more than 70 primary care, specialty, and urgent care clinics. Declaration of Melinda Muller, M.D. ("Muller Decl."), ECF 21 ¶¶ 4–5. Defendant has approximately 14,000 employees and nearly 3,000 affiliated practitioners. *Id.*

Both Plaintiffs worked for Defendant in roles that required direct, in-person contact with patients and coworkers. Plaintiff Amy Hailey worked as the Lead Paramedic/Emergency Department Technician at Defendant's Silverton Medical Center beginning in September 2006. Declaration of Amy Hailey ("Hailey Decl."), ECF 23 ¶ 2. Plaintiff Alisha Kuenzi worked as a registered nurse at Defendant's Silverton Medical Center from April 2018 through October 19, 2021. Declaration of Alisha Kuenzi ("Kuenzi Decl."), ECF 24 ¶ 3.

#### 2. The Relevant Events

In the late months of 2019, SARS-CoV-2, the virus that causes COVID-19, was first reported in China. Expert Report of Dr. Seth Cohen ("Cohen Rep."), ECF 20-1 ¶ 15. Over the following months the virus "explosive[ly]" spread "around the globe." *Id.* By March 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a pandemic. *Id.* It is undisputed here that COVID-19 caused a deadly global pandemic. At its first peak at the end of

2020 and into the beginning of 2021, over 4,000 Americans were dying per day from COVID-19. *Id.* ¶ 29.

When the COVID-19 pandemic began, Defendant implemented policies based on guidance from the Centers for Disease Control and Prevention ("CDC"), the Oregon Health Authority ("OHA"), and the Washington State Health Care Authority ("WSHCA"). Muller Decl., ECF 21 ¶ 5. Defendant also relied on the expertise of its internal clinical leaders. *Id.* Defendant tracked and monitored patient and employee infections and instituted safety measures, such as requiring the use of personal protective equipment ("PPE"), testing, temperature checks, self-reporting illness or symptoms, social distancing when possible, and hygiene protocols (including hand hygiene, environmental disinfection, and room air changes). *Id.* ¶ 8. Defendant issued weekly updates to all employees concerning COVID-19-related developments. *Id.* ¶ 9.

Beginning in the second half of July 2021, the Delta variant became the predominant strain of new COVID-19 cases in the United States and, as a result, the number of anticipated COVID-19 cases "shot dramatically upward." *Id.* ¶ 22. Defendant's own internal forecasting and a publicly available model developed by Oregon Health and Science University ("OHSU") epidemiologist Dr. Peter Graven began predicting a surge in COVID-19 cases that would surpass previous records. *Id.* Between June and September 2021, COVID-19 cases rose by 1,200%, with hospital admissions up by 600% nationwide and, near the peak of the Delta surge, a daily death toll of 1,500 Americans. Cohen Rep., ECF 20-1 ¶ 29. "By December 15, 2021, [one] out of every 100 persons in the [United States] above the age of 65 had died from COVID-19." *Id.* At that time, the United States death toll measured from the beginning of the pandemic exceeded 800,000. *Id.* The risk of Delta transmission was especially high in hospitals, where healthcare

workers and patients were often unable to socially distance. *Id.* ¶¶ 34–35; *see* Muller Decl., ECF 21 ¶ 31.

In response to this trend and its own modeling, Defendant implemented several measures, including reinstituting visitor restrictions and temporarily pausing non-emergency surgical procedures to increase hospital capacity. Muller Decl., ECF 21 ¶ 24. However, Defendant's Senior Leadership Team ("SLT") determined that these efforts, in addition to the measures that Defendant's employees had taken throughout the COVID-19 pandemic, would not be enough, "given the gravity of what [Defendant] and other health systems were facing and the medical science at the time about the importance of vaccination against COVID-19." *Id.* The SLT took note that "many healthcare organizations across the county had begun (or were considering) requiring employees to be vaccinated against COVID-19." *Id.*; *see* Cohen Rep., ECF 20-1 ¶ 28.

On August 5, 2021, Defendant announced to its employees that it would be enacting its Vaccination Policy, requiring all of Defendant's employees to either be fully vaccinated against COVID-19 or receive an approved exception by September 30, 2021.[2] Muller Decl., ECF 21 ¶ 25. All requests for religious or medical exceptions were sent to the Vaccine Exception Work Group for evaluation and decision. *Id.* ¶ 29. On August 25, 2021, the OHA issued its own regulation requiring all healthcare workers to be fully vaccinated or have a documented medical or religious exemption by October 18, 2021. *See* O.A.R. 333-019-1010.

Both Plaintiffs submitted religious exception requests pursuant to Defendant's Vaccination Policy. Hailey Decl., ECF 23 ¶ 7; Kuenzi Decl., ECF 24 ¶ 8. Defendant determined that the Plaintiffs did not qualify for a religious exception and denied both requests. Hailey Decl.,

---

[2] This date was later extended to October 18, 2021.

ECF 23 ¶ 11; Kuezni Decl., ECF 24 ¶ 12. Plaintiffs did not thereafter receive the vaccine, and

Defendant terminated their employment in October 2021. Hailey Decl., ECF 23 ¶ 12; Kuenzi

Decl., ECF 24 ¶ 15.

## B. Evidentiary Issues

### 1. Plaintiffs' Motion to Strike

In their Response to the Motion for Summary Judgment, Plaintiffs "object to and move to

strike (1) Dr. Melinda Muller's declaration and supporting exhibits and (2) the expert report of

Seth Cohen, M.D., M.S.C." Resp., ECF 26 at 13. In Plaintiffs' telling, because Drs. Muller and

Cohen were not disclosed as witnesses under Federal Rule of Civil Procedure 26, Defendant

cannot rely on their testimony for the Motion for Summary Judgment. *Id.* at 15–18. Plaintiffs

further argue that any non-disclosure was prejudicial because they "had no opportunity to either

depose Dr. Muller or Dr. Cohen or to prepare reply expert reports." *Id.* at 17.

Plaintiffs' arguments are unpersuasive in light of this Court's prior discussions with the

Parties. Rule 26(a)(2)(D) requires the disclosure of expert witnesses "at the times and in the

sequence that the court orders." In this case, on December 13, 2023, the Court "vacate[d] all

existing discovery deadlines" in anticipation of Defendant's Motion for Summary Judgment.

Order, ECF 16. In requesting this Court vacate the deadlines, the parties referred to this Court's

similar order in *Lavelle-Hayden et al. v. Legacy Health*, 3:22-cv-01752-IM. ECF 15. In that case,

this Court held the following colloquy with Plaintiffs' counsel, Mr. Hacke:

> THE COURT: I think what [Defendant's counsel is] suggesting is
> that—vacate the current discovery, so basically stay discovery
> until defendants file their motion for summary judgment. *Then if
> you need to take discovery to respond to the motion for summary
> judgment, you can do that and they'll try to accommodate you in
> the time you have to respond.* You'll file a response, they'll reply,
> I'll rule. And then if I rule against defendants, then you can—we'll
> set up another kind of more limited discovery time deadline for

PAGE 7 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S
MOTION FOR SUMMARY JUDGMENT

what you need for trial. You'll have an opportunity at that point to take discovery after I—if I were to deny the motion for summary judgment.

MR. HACKE: If I understand what you're telling me, Your Honor, that basically, you know, once they file their motions, basically I work with them to take—you know, I mean, we're going to have to move quickly given that I have three weeks. *But basically, I work with them to take discovery in response to their motion to address those issues, especially, you know, because—you know, as you know, one of the things in a Rule 56 is there can be no disputed issues of fact. So basically just—so take discovery during that three-week window,* then once you've made your call, we do discovery again, a limited amount of discovery in preparation for trial.

THE COURT: Yes. That sounds reasonable to you?

MR. HACKE: That sounds okay to me.

Transcript of Proceedings, 3:22-cv-01752-IM , ECF 33 at 17:18–18:17 (emphasis added).

As the transcript shows, this Court made clear to Plaintiffs' counsel, and Plaintiffs' counsel expressly acknowledged that he understood, that he would have the opportunity to seek additional discovery after Defendant filed its Motion for Summary Judgment and that both Defendant and this Court would accommodate such discovery. And as the joint motion to vacate discovery deadlines in this case shows, the parties sought the same arrangement here. ECF 15. Despite approving this arrangement, Plaintiffs' counsel did not take advantage of it. After Defendant filed its Motion for Summary Judgment on May 7, 2024, Plaintiffs' counsel did not reach out to seek additional discovery or to depose Dr. Muller or Dr. Cohen. *See* Declaration of Matthew A. Tellam, ECF 31 ¶¶ 3–4. Nor did Plaintiffs' counsel seek an extension of time with this Court for their Response in order to pursue further discovery.

In sum, Defendant did not violate Rule 26 when it disclosed Dr. Muller and Dr. Cohen for the first time in its Motion for Summary Judgment, and this Court accordingly DENIES Plaintiffs' Motion to Strike. This Court purposefully vacated any discovery deadlines so that

PAGE 8 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs could seek further discovery for their Response, and Plaintiffs did not avail themselves of this opportunity. Plaintiffs' counsel's assertions of prejudice are unpersuasive for the same reason: any prejudice was the result of his own lack of diligence. This Court will therefore consider the submission of Drs. Muller and Cohen for the purposes of summary judgment.[3]

### 2.  Inadmissible Hyperlinked Documents

As a preliminary matter, it is also necessary to address various evidentiary issues raised by materials offered in support of Plaintiffs' Response. "When a party opposing summary judgment fails to comply with the formalities of Rule 56, a court may choose to be somewhat lenient in the exercise of its discretion to deal with the deficiency," but "discretionary leniency does not stretch so far that Rule 56[(c)] becomes meaningless." *Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993). In opposing summary judgment, Plaintiffs do not attach any expert report materials to any declarations and instead attempt to introduce evidence in the body of their Response by providing hyperlinks to materials they identify as studies, reports, and articles. *See* Resp., ECF 26 at 21–22. Plaintiffs provide no explanation for why they did this rather than attaching these documents as exhibits to a qualified declarant. Defendant contends that these internet materials cannot be considered at summary judgment because they concern "scientific facts about COVID-19 vaccines" that must be presented "through the testimony of an expert" and because they contain inadmissible hearsay. Reply, ECF 30 at 10. As explained below, Defendant is correct: considering some of these exhibits for purposes of this Motion would stretch Rule 56 too far.

---

[3] Defendant also requests "fees for having to respond" to Plaintiffs' Motion to Strike. Reply, ECF 30 at 4. This Court does not opine on the merits of such a motion at this time.

Plaintiffs cite an August 2021 article from *National Geographic*, which they offer to show that, in Plaintiffs' view, the "COVID-19 vaccines' efficacy [was] very much in dispute . . . at the time the OHA issued its Vaccine Mandate" in August 2021. *Id.* "It is axiomatic to state that newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted . . . ." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, No. CIV 87-987 PHX RCB, 1990 WL 126500, at *3 (D. Ariz. July 25, 1990); *see, e.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008) (holding that plaintiffs' only submission in support of their claim was a newspaper article, "which is hearsay"). Plaintiffs rely on this article for its truth—that COVID-19 vaccines were ineffective, particularly against the Delta variant. Because Plaintiffs offer this article for a hearsay purpose, they must show that it falls within a hearsay exception or that the statements could be made admissible at trial in a different form. Plaintiffs have not done so. This Court will not consider this article for purposes of summary judgment.

Plaintiffs cite what they identify as a December 2020 study "conducted by Pfizer and BioNTech,"[4] which they claim "showed that more people who took COVID-19 vaccines contracted COVID-19 than unvaccinated persons who were given a placebo." Resp., ECF 22 at 22. Yet the document they cite appears to reach the opposite conclusion: it states that "[a]mong 3410 total cases of suspected but unconfirmed COVID-19 in the overall study population, 1594 occurred in the vaccine group vs. 1816 in the placebo group."[5] Pfizer & BioNTech, FDA

---

[4]     This document, which is labeled as an "FDA Briefing Document," appears to summarize the results of two ongoing clinical studies.

[5] Perhaps what Plaintiffs are referring to is the statement on that page of the briefing document that "[s]uspected COVID-19 cases that occurred within 7 days after any vaccination were 409 in the vaccine group vs. 287 in the placebo group." Pfizer & BioNTech, FDA Briefing Document: Pfizer-BioNTech COVID-19 Vaccine 42 (Dec. 10, 2020), https://perma.cc/7X6F-

Briefing Document: Pfizer-BioNTech COVID-19 Vaccine 42 (Dec. 10, 2020),

https://perma.cc/7X6F-8HRW. The study also states that "efficacy in preventing confirmed

COVID-19 occurring at least 7 days after the second dose of vaccine was 95.0%, with 8 COVID-

19 cases in the vaccine group and 162 COVID-19 cases in the placebo group." *Id.* at 6. In any

event, the statements are hearsay, and Plaintiffs have not invoked any hearsay exceptions.

Further, the inferences Plaintiffs wish for this Court to draw must be the subject of expert

testimony, and Plaintiffs have not presented anyone who is capable of testifying to these

contentions. This Court will not consider this study for purposes of summary judgment.

Similarly, Plaintiffs cite an article from *Reason* from August 2021 for the proposition

that, "at the time the OHA issued its Vaccine Mandate, COVID-19 had a survival rate exceeding

99 percent." Resp., ECF 26 at 22. This article, which discusses a fact-checking organization's

evaluation of a viral Instagram post, contains hearsay, and Plaintiffs do not invoke any hearsay

exceptions. Further, the asserted finding must come through an expert with specialized

knowledge. This Court will not consider this article for purposes of summary judgment.

Plaintiffs cite a report provided by BioNTech to the U.S. Securities and Exchange

Commission in March 2022. Resp., ECF 22 at 22. They assert that, in this report, BioNTech

"admitted it lacked proof of its vaccine's safety or efficacy." *Id.* The hyperlink Plaintiffs have

---

8HRW. But the briefing document then goes on to explain that "[i]t is possible that the
imbalance in suspected COVID-19 cases occurring in the 7 days postvaccination represents
vaccine reactogenicity with symptoms that overlap with those of COVID-19." *Id.* And with
respect to *confirmed* COVID-19 cases, the briefing document states that "efficacy in preventing
confirmed COVID-19 occurring at least 7 days after the second dose of vaccine was 95.0%, with
8 COVID-19 cases in the vaccine group and 162 COVID-19 cases in the placebo group." *Id.* at 6.
Such caveats and technical considerations are precisely why such evidence must come through
an expert with a reliable base of knowledge. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.
579, 594–95 (1993) (explaining that Rule 702's "overarching subject is the scientific validity—
and thus the evidentiary relevance and reliability—of the principles that underlie a proposed
submission").

provided leads to a 700-page report. Nowhere in their briefing do Plaintiffs provide a pincite or a quotation to assist this Court in confirming that this document stands for what they claim it does. It is not this Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir. 1995)); *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment."). Because Plaintiffs have not aided this Court in determining whether this 700-page report raises a genuine issue for trial, this Court will not consider it for purposes of summary judgment. *See* Reply, ECF 30 at 12 n.8 (explaining that Plaintiffs "fail to cite any page within the 700-page document that actually contains the statements alleged").

Plaintiffs point to a non-peer-reviewed paper written in November 2021 for the proposition that "[m]any studies, in fact, showed that COVID-19 vaccines exhibited negative efficacy, meaning individuals who took them became more susceptible to contracting COVID-19." Resp., ECF 26 at 22 (emphasis omitted). Even if this analysis, titled *Worldwide Bayesian Causal Impact Analysis of Vaccine Administration on Deaths and Cases Associated with COVID-19: A BigData Analysis of 145 Countries*, states explicitly what Plaintiffs assert, the report itself appears to be hearsay and establishing its reliability would require expert testimony, which Plaintiffs do not present. As proffered by Plaintiffs, this material is not admissible at trial. This Court therefore will not consider this paper for purposes of summary judgment.

Finally, Plaintiffs cite an article from *USA Today* for the proposition that "[c]hildren were even less likely to become seriously ill with, or die from, COVID-19 at [the time OHA issues its Vaccine Mandate]." Resp., ECF 26 at 22. The article contains inadmissible hearsay, Plaintiffs do not invoke any hearsay exceptions, and the inferences Plaintiffs seek for this Court to draw must

be presented through expert testimony. Accordingly, this Court will not consider this article for purposes of summary judgment.

## DISCUSSION

### A.  Clarifying the Issues

Plaintiffs make several arguments that are either redundant or inappropriate at this stage. First, Plaintiffs argue that they can make out a prima facie case for failure to accommodate under Title VII. *See* Resp., ECF 26 at 8–12. For the purposes of this Motion, however, Defendant "is not contesting (1) the sincerity of Plaintiffs' purported religious beliefs; (2) the religiosity of Plaintiffs' purported beliefs; and (3) whether those beliefs conflicted with the Vaccination Policy." MSJ, ECF 19 at 18 n.9. This Court therefore need not address these issues at this time.

Second, Plaintiffs contend that it is a disputed issue of material fact "whether [Defendant] acted with discriminatory motives." Resp., ECF 26 at 18 (capitalization altered). To the contrary, however, this issue is not material to this Motion: Plaintiffs' assertion misunderstands both Title VII and Federal Rule of Civil Procedure 8. "A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). These theories have distinct elements. To prove a prima facie disparate treatment claim, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* (citations omitted). By contrast, a prima facie failure to accommodate claim requires a plaintiff to show that "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he

informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Id.* at 606 (citation omitted). Thus, while an employer's alleged discriminatory motive is relevant to a disparate treatment claim, it is not an element of a failure to accommodate claim.[6] *See Dykzeul v. Charter Commc'ns, Inc.*, CV 18-05826, 2019 WL 8198218, at *10 (C.D. Cal. Nov. 18, 2019) ("[I]t would be superfluous if the same facts supported liability under Title VII for both failure to accommodate and disparate treatment.").

In their Amended Complaint, as Defendant points out, Plaintiffs explicitly pleaded a single Title VII claim for failure to accommodate, not a disparate treatment claim. *See* Reply, ECF 30 at 4–5; Complaint, ECF 1 ¶¶ 40–48 (explicitly addressing the prongs of a failure to accommodate claim and arguing that Defendant "could and should have provided reasonable accommodations for Plaintiffs' beliefs," *id.* ¶ 48). In doing so, Plaintiffs put Defendant on notice that it needed to adduce evidence concerning the elements of a failure to accommodate theory and the undue hardship defense, not the "entirely different defenses" to a disparate treatment claim. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (explaining that a complaint puts "the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations" and "theor[ies] of liability").

---

[6] Plaintiffs' cited cases reinforce this point. Every case Plaintiffs cite involved disparate treatment claims, not a failure to accommodate or the undue hardship defense. *See Hedum v. Starbucks Corp.*, 546 F. Supp. 2d 1017, 1019-25 (D. Or. 2008) (religious disparate treatment and retaliation claims); *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000) (racial disparate treatment claim); *Cain v. Cnty. of Multnomah*, No. 94-466, 1996 WL 328719, at *5–6 (D. Or. June 14, 1996) (racial disparate treatment claim); *Makhzoomi v. Sw. Airlines Co.*, 419 F. Supp. 3d 1136, 1147–48, 1155 (N.D. Cal. 2019) (42 U.S.C. § 1981 racial discrimination claim and field preemption of a state law claim); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088–89 (9th Cir. 2008) (gender-based disparate treatment, retaliation, and hostile work environment claims).

At this late stage, Plaintiffs cannot now attempt to bring into play Defendant's alleged discriminatory motive and thus "maintain a new theory of liability to avoid summary judgment that was not adequately presented in the operative complaint." *James v. Gen. Dynamics Land Sys. Inc.*, 582 F. Supp. 3d 673, 680 (D. Alaska 2022) (footnote omitted). "[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted); *see Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (disallowing a party from raising a new theory of liability at summary judgment that was not adequately pleaded in the original complaint). To permit Plaintiffs to raise a new theory of liability at the summary judgment stage "would be to expect [Defendant] to act as [a] mind reader[] and foresee all possible unalleged claims that *may* fall under a complaint." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1073 (9th Cir. 2023). Because Rule 8 does not require defendants to do this, Plaintiffs' discussion of discriminatory motive is irrelevant to resolving Defendant's Motion for Summary Judgment.[7]

This Court now proceeds to the key issue presented by Defendant's Motion: Whether Defendant can successfully invoke the undue hardship defense under Title VII.

---

[7] An additional issue with Plaintiffs' late about-face is that there is an open question as to whether Plaintiffs ever raised both the reasonable accommodation and disparate treatment theories in their Equal Employment Opportunity Commission charges, as they are required to do under Title VII before filing claims in federal court. *See* 42 U.S.C. § 2000e-5(e)(1), (f); *Crowe v. Wormuth*, 74 F.4th 1011, 1023 (9th Cir. 2023). In the Americans with Disabilities Act context, courts have held that raising one theory but not the other during the administrative process forfeits the unraised theory in subsequent federal court proceedings. *See, e.g.*, *Jefferson v. Time Warner Cable*, No. CV 11-5637, 2012 WL 12887692, at *15 (C.D. Cal. July 23, 2012); *Huang v. Seattle Pub. Libr.*, No. C14-1986, 2016 WL 3405486, at *4–5 (W.D. Wash. June 21, 2016).

**B. Undue Hardship**

This Court answers that question yes. Because Defendant concedes at this stage that Plaintiffs made a prima facie failure to accommodate claim under Title VII, the burden shifts to Defendant to demonstrate that it was unable to reasonably accommodate Plaintiffs' needs without undue hardship. *See Bolden-Hardge v. Off. of the Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023). The Supreme Court recently clarified the showing a defendant must make to establish undue hardship as an affirmative defense. "In common parlance, a 'hardship' is, at a minimum, 'something hard to bear.'" *Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023). "'[U]ndue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* As described below, undue hardship is properly analyzed cumulatively and by considering both economic and non-economic costs, viewed at the time Defendant decided to deny Plaintiffs' requested religious exemptions and then terminate their employment for refusing to obtain the COVID-19 vaccine.[8]

**1. Analysis of Undue Hardship**

The following framework is drawn largely from this Court's prior opinions on summary judgment in *MacDonald v. Oregon Health & Science University*, No. 3:22-cv-01942-IM, 2024 WL 3316199, at *6–7 (D. Or. July 5, 2024), and *Snow v. Women's Healthcare Associates, LLC*, No. 3:23-cv-01393-IM, 2024 WL 3640111, at *5–6 (D. Or. Aug. 2, 2024).

**a. Economic and Non-Economic Costs**

Before *Groff*, federal courts regularly considered both economic and non-economic costs when conducting the undue hardship analysis. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859

---

[8] As all Parties agree, Plaintiff's state law claim is subject to identical analysis given that "O.R.S. 659A.030 is modeled after Title VII." *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1100 (D. Or. 2007); *see* MSJ, ECF 19 at 19 n.10; Resp., ECF 26 at 14.

PAGE 16 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

F.2d 610, 615 (9th Cir. 1988) (acknowledging that "spiritual costs can exist" in an undue hardship analysis); *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009) ("Both economic and non-economic costs can pose an undue hardship upon employers; the latter category includes, for example, violations of the seniority provision of a collective bargaining agreement and the threat of possible criminal sanctions."); *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 134 (1st Cir. 2004) ("Th[e undue hardship] calculus applies both to economic costs, such as lost business or having to hire additional employees to accommodate a Sabbath observer, and to non-economic costs, such as compromising the integrity of a seniority system."); *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship for an employer-prison.").

Indeed, the Third Circuit's decision in *Groff*, which the Supreme Court later vacated, stated that "[b]oth economic and non-economic costs suffered by the employer can constitute an undue hardship." *Groff v. DeJoy*, 35 F.4th 162, 174 (3d Cir. 2022), *vacated and remanded*, 600 U.S. 447 (2023). In clarifying the requisite showing for the undue hardship standard, the Supreme Court in *Groff* did not entirely displace the way the Third Circuit considered costs. Rather, the *Groff* Court reiterated that courts "must apply the test in a manner that takes into account *all relevant factors* in the case at hand" and always return to the question of the "substantial increased costs in relation to the *conduct of [an employer's] particular business*." 600 U.S. at 470 (emphasis added). The *Groff* Court even noted that "a good deal of the [Equal Employment Opportunity Commission]'s guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today." *Id.* at 471. That guidance directs

employers to consider "not only direct monetary costs but also the burden on the conduct of the employer's business." *See* MSJ, ECF 19 at 22 (citation omitted).

Following *Groff*, district courts have continued to consider both economic and non-economic costs in the undue hardship analysis. *See, e.g.*, *Bordeaux v. Lions Gate Ent., Inc.*, No. 22-cv-04244, 2023 WL 8108655, at *13 (C.D. Cal. Nov. 21, 2023) (considering the safety risk an unvaccinated employee posed to her coworkers in the undue hardship analysis); *Williams v. Legacy Health*, No. 22-cv-06004, 2024 WL 3993162, at *6-7 (W.D. Wash. Aug. 29, 2024) (same).

Consistent with the pre- and post-*Groff* authority, this Court holds that it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks to other employees, in analyzing undue hardship.

### b. Information Available at the Time

Along with considering both economic and non-economic costs when assessing undue hardship, this Court further holds that it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision. This approach comports with how courts analyze whether a plaintiff has alleged a prima facie case against an employer—assessing the information the plaintiff provided to the employer and, thus, the information of which the employer had notice. *See Craven v. Shriners Hosps. for Child.*, No. 3:22-cv-01619-IM, 2024 WL 21557, at *4 n.3 (D. Or. Jan. 2, 2024). "It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023), *vacated on denial of reh'g*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023). Although *Kluge* was vacated and remanded

following the Supreme Court's ruling in *Groff*, this Court considers this aspect of the Seventh Circuit's decision to remain applicable and persuasive post-*Groff*.

This approach also comports with common sense. To judge an employer's undue hardship decision based on knowledge and information developed after the fact would hold that employer to an impossible standard. Courts would be tasked with judging an employer's decision with the benefit of hindsight, irrespective of factors like the consensus of reputable organizations, the evolving nature of a situation, and the type and quality of information available at the time. Title VII does not require employers to predict the future. *See Kluge*, 64 F.4th at 888 ("To suggest that the employer may be held liable for a decision to withdraw an accommodation based on information that did not exist at the time of the decision holds employers to an impossible 'crystal ball' standard."). In determining whether an accommodation would pose an undue hardship, an employer is permitted to draw conclusions based on evidence and information that was available at the time. This Court will limit its analysis accordingly.

### c. Cumulative or Aggregate Effects

This Court further holds that, in some circumstances, it is appropriate for a court to consider the aggregate or cumulative effects of an accommodation when multiple, similarly situated employees request the same accommodation. This approach comports with both Supreme Court precedent and Equal Employment Opportunity Commission ("EEOC") guidance.

As *Groff* took pains to explain, undue hardship "takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." 600 U.S. at 470–71 (citation and internal quotation marks omitted). These factors naturally include the "aggregate effects when multiple employees are granted the same accommodation." *Together Emps. v. Mass Gen.*

*Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022); *see, e.g.*, *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674, 2024 WL 278973, at *7 (W.D. Wash. Jan. 25, 2024); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309 (D. Haw. 2022), *appeal dismissed*, No. 22-15558, 2022 WL 19767107 (9th Cir. Oct. 13, 2022). Thus, in *Trans World Airlines, Inc v. Hardison*, the Supreme Court expressly chastised the dissent for "fail[ing] to take account of the likelihood that a company as large as [Trans World Airlines] may have many employees whose religious observances, like [the plaintiff's], prohibit them from working on Saturdays or Sundays." 432 U.S. 63, 84 n.15 (1977). Consistent with this precedent, the EEOC has issued guidance for COVID-19 reasonable accommodations instructing that "[a] relevant consideration is the number of employees who are seeking a similar accommodation, i.e. the cumulative cost or burden on the employer."[9] EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws § L.3 (updated Mar. 1, 2022), https://perma.cc/J23B-YD4G.

Applying this principle, this Court finds that the following rule should govern in COVID-19 vaccine mandate cases: where, as here, multiple plaintiffs all had direct, in-person contact with patients and coworkers and requested the same accommodation, it is appropriate to consider the aggregate effect of the requested accommodation as part of *Groff*'s totality-of-the-circumstances test. To be clear, this aggregation principle does not, and should not be construed to, erase the context-specific nature of undue hardship. This Court thus does not opine on how

---

[9] Under *Groff*, both *Hardison* and the EEOC remain valid sources of authority with respect to the undue hardship test. *See* MSJ, ECF 19 at 21–2225 nn.11–12. The *Groff* Court stated that it had "no reservations in saying that a good deal of the EEOC's guidance in [the undue hardship] area is sensible and will, in all likelihood, be unaffected by" its ruling. 600 U.S. at 471. Likewise, the *Groff* Court declined to overrule *Hardison* and instead clarified the precise holding of *Hardison* and that an undue hardship is not "more than a *de minimis* cost." *Id.* at 468.

this principle would apply in other employment contexts involving, among other things, different kinds of accommodations and work duties.

*   *   *

Employing the framework elaborated above, this Court now considers the admissible evidence presented by the Parties.

### 2.  Defendant Is Entitled to Summary Judgment

#### a.  Defendant's Evidence

Defendant attaches one Declaration and one expert report to its Motion for Summary Judgment. Muller Decl., ECF 21; Cohen Rep., ECF 20-1. Because Defendant bears the ultimate burden on its affirmative defense, it must demonstrate that "the record is so one-sided as to rule out the prospect of the nonmovant prevailing." 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727.1 (West 2024). Accordingly, the following discussion walks through the evidence produced by Defendant.

#### i.  Declaration of Dr. Muller

Dr. Muller is a physician who currently serves as the Chief Medical Officer for Defendant. Muller Decl., ECF 21 ¶¶ 1–2. She previously served as Defendant's Interim Chief Medical Officer in 2020 and its Associate Chief Medical Officer in 2021. *Id.* ¶ 1. In the summer of 2021, she was a member of Defendant's SLT, which decided to implement Defendant's Vaccination Policy in August 2021. *Id.* ¶ 3. Defendant operates eight hospitals and more than seventy primary care, specialty, and urgent care clinics, collectively employing 14,000 workers and an additional 3,000 affiliated healthcare practitioners. *Id.* ¶ 4.

At the onset of the COVID-19 pandemic, Defendant "strived to rely on" scientific consensus, agency guidance from the CDC, OHA, and WSHCA, and the expertise of its own

PAGE 21 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

internal clinical leaders in implementing COVID-19-related policies and procedures. *Id.* ¶ 5. The

SLT's "overarching goals" were to ensure that Defendant, "as a major regional healthcare

provider," provided the "safest possible environment for patients and employees, while

maintaining public trust in [Defendant's] capabilities during a major global event." *Id.*

      Defendant faced several challenges in attempting to stem COVID-19. Patients delayed or

declined to seek care, meaning that when patients "finally did obtain treatment at [Defendant's]

facilities," their health conditions were "more dire." *Id.* ¶ 6. Defendant's facilities were

continuously at capacity. *Id.* Defendant suspended elective surgeries and non-emergent and

urgent care so that patient care staff could be redeployed to address COVID-19 patients. *Id.*

Further, because employee use of sick time was "significantly higher than normal" during the

pandemic and "hundreds of employees [were] often out sick or on work restrictions at any given

time," Defendant had additional issues providing patient care. *Id.* ¶ 7.

      Defendant sought to limit the spread of COVID-19 within its facilities. Defendant

implemented an "Infection Control Plan" that was shared with all employees and tracked and

monitored patient and employee infections. *Id.* ¶ 8. Defendant communicated with its employees

through daily "huddles," weekly written updates, and various newsletters. *Id.* ¶ 9. As noted,

Defendant required the use of PPE, testing, temperature checks, self-reporting, social distancing

when possible, various hygiene protocols, environmental disinfection, and room air changes. *Id.*

¶ 8. Each of these measures had its limitations. *Id.* For instance, PPE must be properly worn at

all times in order to function effectively. *Id.* Break rooms were a concern for Defendant because

employees would eat without masks or congregate without masking. *Id.* And Defendant could

not require that employees mask while not at work. *Id.*

PAGE 22 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S
MOTION FOR SUMMARY JUDGMENT

Defendant received its first shipment of COVID-19 vaccines in mid-December 2020. *Id.*
¶ 13. Defendant began offering vaccination to all employees on January 14, 2021. *Id.* ¶ 15. By
March 4, 2021, approximately 70% of employees were vaccinated. *Id.* ¶ 16. In an effort to have
more employees vaccinated, Defendant streamlined the process for scheduling vaccinations,
secured additional space at the Oregon Convention Center to administer COVID-19 vaccines,
offered additional sick pay for employees who were fully vaccinated, worked with staff leaders
to encourage voluntary vaccination, and offered raffles for fully vaccinated employees. *Id.* ¶ 17.
As a result of these efforts, on July 1, 2021, Defendant's employee vaccination rate was
approximately 84%. *Id.* ¶ 18. This meant that approximately 2,240 employees remained
unvaccinated on that date. *Id.* ¶ 19.

This higher rate of vaccination generally coincided with a decrease in COVID-19 case
counts at Defendant's facilities. *Id.* ¶ 20. For instance, on February 25, 2021, the number of
COVID-19 positive hospitalized patients had declined 83% from the previous peak on December
1, 2020. *Id.* That said, hospitalizations and cases began increasing in spring 2021, before the
Delta variant of COVID-19 arrived in summer 2021. *Id.*

The SLT monitored Defendant's internal metrics on COVID-19 case counts and patient
capacity, as well as Oregon's publicly available COVID-19 forecasting models developed by
OHSU epidemiologist Dr. Peter Graven. *Id.* ¶ 21. In the second half of July 2021, as the Delta
variant became the predominant strain of new COVID-19 cases in the United States, the number
of anticipated COVID-19 cases rose "dramatically," and both the Graven Model and Defendant's
internal forecasting predicted a record-breaking surge in COVID-19 cases. *Id.* ¶ 22. Defendant's
models from July 20 to August 2, 2021, forecasted dramatic upward swings in the number of
COVID-19 cases. *See id.*, Exs. 17–19.

PAGE 23 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S
MOTION FOR SUMMARY JUDGMENT

Defendant implemented several measures in anticipation of this surge, such as visitor restrictions and a pause on non-emergency surgical procedures. *Id.* ¶ 24. "But there was a strong consensus among the SLT that those efforts, along with the safety measures that [Defendant's] employees had taken throughout the pandemic, would not be enough given the gravity of what [Defendant] and other health systems were facing and the medical science at the time about the importance of vaccination against COVID-19." *Id.* The SLT was "mindful that many healthcare organizations across the country had begun (or were considering) requiring employees to be vaccinated against COVID-19." *Id.* Defendant accordingly implemented its Vaccination Policy in August 2021. *Id.* ¶ 25.

The SLT "determined that the Vaccination Policy was necessary" for several reasons. *Id.* ¶ 28. To begin with, the scientific consensus was that the available vaccines were safe and highly effective at preventing infection and reducing cases of severe illness and death. *Id.* ¶ 28(a)(i). The scientific consensus was also that vaccinated individuals tended to carry a lower viral load and were thus less likely to spread COVID-19 than unvaccinated individuals. *Id.* ¶ 28(a)(ii). Further, the scientific consensus was that while other safety measures, such as PPE, testing, and hygiene protocols, were "an important part of the control process," vaccination nonetheless "provided all of the benefits – with none of the limitations – of the other safety measures." *Id.* ¶ 28(a)(iii). In addition, Defendant determined that COVID-19 represented a "grave threat" to its patients, many of whom were susceptible to severe illness and death due to their age or preexisting medical conditions. *Id.* ¶ 28(a)(iv). The Delta variant was spreading quickly and threatened to further burden Defendant's system. *Id.* ¶ 28(a)(v).

Defendant had "a responsibility to provide the highest possible level of patient care and to protect patients, employees, and visitors from unreasonable safety risks." *Id.* ¶ 28(a)(vi). To

fulfill this responsibility, Defendant needed to maintain adequate staffing levels, and it "would be less likely to do so if employees were out ill with COVID-19 (which, among other consequences, might result in employees working longer hours or taking on additional shifts)." *Id.* ¶ 28(a)(vii). Ultimately, "[a]s a major regional healthcare system, [Defendant] was committed to ensuring that members of the public felt safe accessing medical care at its facilities and believed that ensuring all employees were fully vaccinated would help foster that trust." *Id.* ¶ 28(a)(viii).

After announcing its Vaccination Policy, Defendant continued to evaluate its implementation and, specifically, "whether employees with approved exceptions could be accommodated in on-site roles." *Id.* ¶ 30. "Ultimately, the SLT determined that, consistent with available science, having any unvaccinated employees continue in-person work presented an unreasonable health and safety risk, and it made only a handful of exceptions for individuals who could do their jobs privately and without the possibility of encountering other employees or patients."[10] *Id.* In reaching this conclusion, the SLT observed "that transmissions were still occurring even as [Defendant] took all appropriate steps to prevent them." *Id.* ¶ 31. The SLT believed "that allowing even a single unvaccinated worker to come into contact with patients or other employees would increase the risk of patient and employee infections, employee absences, or lead to other undesirable consequences that [would] hinder[] [Defendant's] ability to provide the safest possible environment for patients and employees." *Id.* Those consequences included "the potential harm that could result from allowing even a single unvaccinated employee to work

---

[10] Without presenting any evidence, Plaintiffs assert that "[i]t was not reasonable to fire all non-vaccinated employees." Resp., ECF 26 at 25. But as the unrefuted record shows, Defendant did not fire "all non-vaccinated employees."

with or near patients (many of whom are at heightened risk of infection to the point that commonplace items such as fresh flowers or fruit cannot be placed in their rooms)."[11] *Id.* The SLT was also "mindful that hundreds of employees had requested exceptions, which only increased the overall risk." *Id.*

By October 2021, 96% of Defendant's employees were fully vaccinated. *Id.* ¶ 34. ICU admissions at Defendant's facilities peaked in September 2021, and nearly 200 COVID-19-positive patients were receiving care at Defendant's facilities at various points that month, "a dramatic increase from previous highs in December 2020." *Id.*

### ii. Expert Report of Dr. Seth Cohen

Defendant has retained, and provides an expert report from, Dr. Seth Cohen, who has worked for "nearly 15 years in epidemiology, internal medicine, and infectious disease" and whose "experience and expertise [is] focused on the science, spread, mitigation, and treatment of infectious diseases, including . . . COVID-19." Cohen Rep., ECF 20-1 ¶¶ 1, 12, 14.

Dr. Cohen states that, "[i]n [his] opinion informed by scientific consensus and experience caring for patients with COVID-19, COVID-19 presented a threat to patients and healthcare workers in an[d] around summer and fall 2021. Because of this threat, mandatory COVID-19 vaccination policies were absolutely critical to protecting employees and patients at healthcare facilities." *Id.* ¶ 38. Dr. Cohen adds that "because vaccination was fundamentally different from other protective measures in how it protected individuals from COVID-19, and because no single measure was 100% effective on its own in protecting individuals from COVID-19, it was [his]

---

[11] Defendant's statistics showed that the patients who arrived at its facilities were "by and large" unvaccinated. Muller Decl., ECF 21 ¶ 33. As of late August 2021, over 85% of COVID-19 patients hospitalized at Defendant's facilities were unvaccinated. *Id.* Approximately 90% of COVID-19 patients on a ventilator were unvaccinated, and 91% of patients in the intensive care unit ("ICU") for COVID-19 reasons were also unvaccinated. *Id.*

medical opinion in and around summer and fall 2021 that healthcare organizations should require both vaccination and non-vaccination measures to most effectively mitigate the risks presented by COVID-19." *Id.*

With respect to alternative mitigation measures, Dr. Cohen states that although they "can be effective," they were and are not a substitute for vaccination. *Id.* ¶¶ 35–37. Testing was not a substitute because it was not "perfectly accurate," and employees who recorded a false negative test in the early days of their infection could "contribute[] to significant outbreaks among patients, colleagues, and families." *Id.* ¶ 35. Similarly, false positive tests could "be quite disruptive to workplace staffing." *Id.*. Additionally, "[t]urn around times for diagnostic testing are quite variable and may lead to significant delays in obtaining actionable results." *Id.* Sick leave policies were also insufficient "[d]ue to the possibility of asymptomatic or pre symptomatic transmission." *Id.* ¶ 36. PPE likewise had issues: while "[m]asks help prevent acquisition of infection," they "do not help to diminish severity of symptoms once someone is infected." *Id.* ¶ 37. "It is impossible to wear PPE constantly, without interruption," and based on Dr. Cohen's experience with contact tracing, "many cases of COVID-19 acquired in healthcare settings occurred in break rooms (where healthcare workers had already doffed their PPE) as well as in the community." *Id.* And in Dr. Cohen's view, "[w]hile social distancing is complementary to decreasing spread of infection, healthcare is by nature a team endeavor and it is impossible to socially distance at all times while working on site in healthcare." *Id.*

Dr. Muller states that she has reviewed Dr. Cohen's report. Muller Decl., ECF 21 ¶ 35. Dr. Muller attests that Dr. Cohen's "opinion is consistent with [Defendant's] information at the time it implemented its Vaccination Policy." *Id.* Further, she attests that "the medical science Dr. Cohen relied upon in authoring his report represents many of the same materials [Defendant]

w[as] reviewing throughout the pandemic" and that "Dr. Cohen's conclusions are the same conclusions that [Defendant] reached in deciding to implement the Vaccination Policy." *Id.*

### b. Defendant's Evidence Establishes that Accommodating Plaintiffs Posed an Undue Hardship

Defendant has established that accommodating Plaintiffs—by allowing them to continue working at Defendant's facilities while unvaccinated—would have undermined Defendant's legitimate mission, creating a substantial increased cost and, hence, an undue hardship. In opposing summary judgment, Plaintiffs agree with Defendant that this Motion concerns persons "whose jobs required in-person interaction with [other] persons at [Defendant's] Silverton Medical Center." Resp., ECF 22 at 7.

As Defendant points out, it is a "major regional healthcare system" with "a responsibility to provide the highest possible level of patient care and to protect patients, employees, and visitors from unreasonable safety risks." Reply, ECF 30 at 6. Defendant "needed to maintain adequate staffing levels to provide high-quality patient care" and "would be less likely to do so if employees were out ill with COVID-19." *Id.* Defendant "was responsible for ensuring that members of the public felt safe accessing medical care at its facilities." *Id.* And Defendant's "decision-making process during the COVID-19 pandemic" was rooted in this "mission and those responsibilities." *Id.* These factors are critical to the undue hardship analysis, for "[w]here, as here, 'the employer's business involves the protection of lives,' [courts] are reluctant to 'restructure its employment practices.'" *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 F. App'x 822, 828 (11th Cir. 2020) (per curiam) (brackets omitted) (quoting *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995)); *see United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976). Similarly, when a proposed accommodation compromises safety in the

workplace, this, too, can present an undue hardship. *See, e.g.*, *Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 758 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999).

Before the COVID-19 vaccine became available, Defendant implemented several measures aimed at protecting against COVID-19. MSJ, ECF 19 at 5–7. Defendant required the use of PPE, testing, temperature checks, self-reporting, social distancing, hygiene protocols, environmental disinfection, and room air changes. *Id.* at 6. Defendant consistently communicated with its employees through various means. *Id.* Defendant suspended elective surgeries and non-emergent and urgent care so that it could reallocate patient care staff to address COVID-19 patients. *Id.* at 5. Despite these efforts, COVID-19-related hospitalizations and deaths continued to grow and peaked in December 2020. *Id.* at 6-7. Defendant even began using refrigerated semi-truck trailers as temporary overflow morgues for deceased patients. *Id.* at 7 (citing Muller Decl., ECF 21 ¶ 10 & Ex. 3).

Thus, when the vaccine became available beginning in December 2020, Defendant determined that "their arrival was an important step in reducing the impact of COVID-19 at healthcare facilities" such as Defendant's. *Id.* at 7. "[T]he medical consensus [was] that vaccination against COVID-19 was the best tool available to reduce the likelihood of infection and transmissibility, along with severe illness and death." *Id.* at 10. The vaccines, Defendant found, were "unparalleled in their ability to protect both healthcare workers and their patients." *Id.* at 8. In part, this was because "[w]hile the safety measures [Defendant] took before vaccines arrived . . . [were] highly effective, all [were] subject to practical limitations in a work environment." *Id.* at 8. And due to these limitations, Defendant had a "major concern" about, among other things, employees eating or congregating without masks in breakrooms, as well as

general spread within the community. *Id.* Vaccination could help remedy these issues in ways no other measure could.

Even with some of Defendant's employee population vaccinated, the rise of the Delta variant in summer 2021 threatened further waves of infection. Both outside and internal modeling showed that in July and August of 2021, Defendant's COVID-19 case count threatened to dwarf past hospitalization numbers up to that point. *Id.* at 12. And while Defendant undertook measures in response to this modeling—such as reinstituting visitor restrictions and pausing non-emergency surgical procedures—"there was a strong consensus that those efforts, along with the safety measures that [Defendant's] employees had taken throughout the pandemic, would not be enough." *Id.* As the situation evolved and Defendant instituted its Vaccination Policy, Defendant found that transmissions were still occurring—increasing the risk of patient and employee infection and employee absences—even with all of its measures. *Id.* at 15. Indeed, ICU admissions peaked at Defendant's facilities in September 2021 and nearly 200 COVID-19-positive patients were receiving care, "a dramatic increase from previous highs in December 2020." *Id.* at 16. This was especially concerning given Defendant's patient population, "many of whom were particularly susceptible to severe illness and death due to their age and/or pre-existing medical conditions." *Id.* at 14. And it was also concerning because Defendant's modeling showed that the Delta variant would "place additional stress on [Defendant's] already overburdened system." *Id.*

Based on the information and evidence available to it at the time, Defendant reasonably concluded that allowing unvaccinated employees to have direct, in-person contact with patients and employees posed a substantial increased cost. Guidelines from the CDC and WHA, which Defendant reasonably concluded bore indicia of validity and reliability, combined with its own

internal data analysis, led Defendant to conclude that unvaccinated employees working in-person would put other staff members and a vulnerable patient population at risk. And allowing staff and patients to be put at risk compromised Defendant's mission to serve the community and keep it safe. Thus, allowing Plaintiffs to continue as employees without vaccination would have unduly burdened Defendant's mission and, by extension, the conduct of its particular business. *See* MSJ, ECF 19 at 26–28. Title VII did not require Defendant to incur this substantial cost. *Bushra v. Main Line Health, Inc.*, No. 23-1090, 2023 WL 9005584, at *8 (E.D. Pa. Dec. 28, 2023) (concluding on summary judgment that a healthcare facility "would have incurred undue hardship in the form of substantial social, if not economic, costs if it had been required to accommodate" an emergency room physician's COVID-19 religious exemption request); *Antredu v. Mass. Dep't of Youth Servs.*, No. 22-12016, 2024 WL 1539725, at *5 (D. Mass. Apr. 9, 2024) (concluding on summary judgment that the plaintiff, a juvenile justice youth development specialist, "would put his colleagues, clients, and their families at a higher risk for contracting COVID-19" and that his employer "may have also lost the confidence of some clients were they to learn that" plaintiff was working with youth while unvaccinated, which would have substantially burdened the employer); *Bordeaux v. Lions Gate Ent., Inc.*, No. 22-cv-04244, 2023 WL 8108655, at *13 (C.D. Cal. Nov. 21, 2023) (concluding on summary judgment that an employer faced an undue hardship because "[a]ccommodating Plaintiff's [COVID-19 vaccine] exemption request would have put the lives of her fellow cast and crew members in danger" and replacing coworkers who became seriously ill would have been expensive and time-consuming).

Furthermore, the cumulative cost would have been substantial. Plaintiffs argue that Defendant "has provided nothing from which Court can determine the negative health

ramifications of the 4% of employees remaining unvaccinated and taking other precautionary measures." Resp., ECF 26 at 25. But this arrangement would have left 560 employees unvaccinated, relying on safety measures with proven flaws that only vaccination could remedy. The unrefuted evidence shows that a single unvaccinated employee in a breakroom during a lunch break could have compromised both employee and patient safety. The unrefuted evidence shows, too, that a single unvaccinated employee interacting with a vulnerable patient could have compromised both employee and patient safety. One need only multiply these interactions by 560 to see the error in Plaintiffs' assertion. *See Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674, 2024 WL 278973, at *7 (W.D. Wash. Jan. 25, 2024).

        Moreover, to the extent that Plaintiffs are arguing that Defendant should have taken a "wait and see" approach to the consequences of permitting unvaccinated employees to continue to have direct, in-person contact with patients and coworkers during the largest surge of COVID-19 cases up to that point, Title VII case law is clear that "an employer is not required 'to wait until it feels the effects' of the proposed accommodation before determining its reasonableness." *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008) (Wilkinson, J.) (brackets omitted) (quoting *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000)); *see Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 519 (6th Cir. 2002) ("[A]n employer does not have to actually experience the hardship in order for the hardship to be recognized as too great to be reasonable."); *Favero v. Huntsville Indep. Sch. Dist.*, 939 F. Supp. 1281, 1293 (S.D. Tex. 1996) ("Plaintiffs' emphasis on reviewing the situation in hindsight would allow employers to deny requests only when they were certain in advance that the requested [accommodation] would cause an undue hardship. This is not what Title VII requires."), *aff'd*, 110 F.3d 793 (5th Cir. 1997).

PAGE 32 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

### c.   Plaintiffs Fail to Rebut Defendant's Evidence

As discussed above, much of Plaintiffs' evidence is inadmissible and cannot be considered for resolving this Motion. The remainder of Plaintiffs' evidence fails to raise a genuine dispute of material fact as to Defendant's undue hardship determination. *See Isaac v. Exec. Off. of Health & Hum. Servs.*, No. 22-11745, 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023) (concluding on summary judgment that accommodating the plaintiff's COVID-19 vaccine exemption request would pose an undue hardship to plaintiff's employer where plaintiff "challenge[d] only the underlying assumption that the vaccine protects against infection" but presented no evidence to support that challenge), *appeal dismissed*, No. 23-2065, 2024 WL 3159284 (1st Cir. Feb. 22, 2024). This Court notes that Plaintiffs presented evidence only with respect to the vaccine's effectiveness and did not attempt in any way to distinguish between the various Plaintiffs.

Plaintiffs cite a media statement from July 2021 made by then-CDC Director Rochelle P. Walensky. Resp., ECF 26 at 21–23. Setting to the side issues of authentication, and assuming that Plaintiffs offer this media statement for a non-hearsay purpose, this statement still does not create a genuine dispute of fact. The statement advised that some data "demonstrat[e] that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus."[12] As Defendant explains, this statement concerns "the viral loads of persons who have already

---

[12] The hyperlink provided by Plaintiffs redirects to an archived version of this media release. Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR, CDC (July 30, 2021), https://archive.cdc.gov/www_cdc_gov/media/releases/2021/s0730-mmwr-covid-19.html (archived Nov. 16, 2023).

suffered an infection of COVID-19" and not "whether vaccines help prevent" infection in the

first place. Reply, ECF 30 at 11 (emphasis omitted). Furthermore, Defendant was not focused

solely on whether vaccination reduced the risk of transmission—it was also concerned with

potential reduction in severe or critical COVID-19 and reduction in reinfection. *See* MSJ, ECF

19 at 13–14. Even construing the evidence in Plaintiffs' favor and resolving reasonable

inferences in her favor, this statement does not create a triable issue here. Defendant's evidence

still establishes that, based on the information available, it reasonably concluded that the

COVID-19 vaccine was a necessary measure for patient-facing staff members like Plaintiffs.

Plaintiffs also cite a report provided by BioNTech to the U.S. Securities and Exchange

Commission in March 2022. Resp., ECF 26 at 22. They state that in this report BioNTech

"admitted it lacked proof of its vaccine's safety or efficacy." *Id.* As discussed above, Plaintiffs

failed to provide a pin cite or a quotation to assist this Court in confirming that this 700-page

report stands for what she claims it does, and it is not this Court's task "to scour the record in

search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279. Regardless, assuming this

report supports Plaintiffs' proposition, it still does not create a genuine issue of fact. Statements

made by a vaccine manufacturer in March 2022 do not create a triable issue of fact about what

Defendant understood in the fall and summer of 2021.

## C.  Aiding and Abetting

Defendant moves for summary judgment on Plaintiffs' aiding and abetting claim against

unnamed Does under O.R.S. 659A.030(1)(g). *See* MSJ, ECF 19 at 28. Plaintiffs nowhere address

this point in response to Defendant's Motion. They do not present evidence identifying who

these Does are or what their purported actions were. And because Defendant did not violate Title

VII or O.R.S. 659.A.030, the derivative aiding and abetting claim must necessarily fail.

PAGE 34 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S
MOTION FOR SUMMARY JUDGMENT

## CONCLUSION

While Plaintiffs wish to dispute the efficacy of COVID-19 vaccines, they have presented no admissible evidence on that score, and ultimately, cannot refute the *Groff*-mandated, common-sense proposition that medical-care employers are entitled to rely on medical consensus in making critical decisions. That medical consensus found that vaccines could protect against COVID-19 in ways no other measure alone could. This unrefuted fact—in tandem with Defendant's mission, and with the abundant and well-established, unrefuted evidence of COVID-19's effect on Defendant's patients, employees, and ability to fulfill that mission— decides this case. Defendant's Motion for Summary Judgment, ECF 19, is GRANTED.

**IT IS SO ORDERED.**

DATED this 20th day of September, 2024.

/s/ Karin J. Immergut

Karin J. Immergut
United States District Judge

PAGE 35 – OPINION AND ORDER GRANTING DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT